IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MICHAEL WAYNE SLAY,

     Plaintiff,

vs.                                                                 Case No.: 3:13cv610/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

     Defendant.

_____/


## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 4, 5).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Plaintiff challenges the decision of the Administrative Law Judge ("ALJ") on grounds that: (1) the ALJ made an erroneous Residual Functional Capacity ("RFC") assessment by failing to give substantial weight to the medical opinion of Plaintiff's treating physician; and (2) and presented the Vocational Expert with an incomplete hypothetical question.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence and application of proper legal standards; thus, the decision of the Commissioner is affirmed.

I.       PROCEDURAL HISTORY

On June 26, 2011, Plaintiff filed an application for DIB, alleging disability beginning January 1, 2011.  On October 18, 2011, and January 23, 2012, Plaintiff's application was denied initially and then upon his motion for reconsideration.  Plaintiff then requested a hearing before an ALJ, and one was held on April 2, 2013.  On July 9, 2013, ALJ Renee Blackmon Hagler issued her decision denying benefits (doc. 7-2 at 18–30).  Plaintiff sought review of the ALJ's decision, which the Appeals Council denied on November 18, 2013 (*id.* at 1–3).  The ALJ's decision stands as the final decision of the Commissioner, and is properly subject to review in this court.  Ingram v. Comm'r of Soc. Sec., 496 F.3d 1253, 1262 (11th Cir. 2007).

II.      FINDINGS OF THE ALJ

In denying Plaintiff's claim, the ALJ made the following relevant findings (*see* tr. 18–30):

1.      The claimant meets the insured status requirements of the Act through December 31, 2014.

2.      The claimant has not engaged in substantial gainful activity since January 1, 2011, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: lumbar degenerative disc disease, generalized osteoarthrosis, hypertension, chronic obstructive pulmonary disorder ("COPD"), and depression (20 C.F.R. § 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, the undersigned ALJ finds that the claimant has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except for the following limitations: he can lift/carry twenty pounds occasionally and ten pounds frequently; he can sit six hours in an eight-hour workday and stand and walk in combination six hours in an eight-hour workday; he can occasionally bend, stoop, kneel, crouch, and crawl; and he would require a position involving only simple tasks with short, simple instructions.

6.      The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7.      The claimant was born on August 29, 1963, and was 47 years old, which is defined as a younger individual aged 18–49, on the alleged disability onset date (20 C.F.R. § 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

   9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the he has transferable job skills (*see* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

   10.  Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

   11.  The claimant has not been under a disability, as defined in the Act, from January 1, 2011, through July 9, 2013, the date of the ALJ's decision (20 C.F.R. § 404.1520(g)).

## III. STANDARD OF REVIEW

   Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence

preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   Id. § 423(d)(2)(A).  Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     RELEVANT HEARING TESTIMONY & MEDICAL HISTORY

A.      Plaintiff's Hearing Testimony

Plaintiff testified at his April 2, 2013, hearing before the ALJ as follows.  He can read and write, add and subtract, and make change, but his daughter helps him with financial matters (Tr. 41). Plaintiff stated that, although he was drinking heavily after his wife passed away, he no longer drinks and does not take illegal drugs but does smoke a half a pack of cigarettes per day, which he gets from his daughter-in-law (Tr. 45, 53).  Plaintiff last worked at a job during 2011, cleaning aquariums and vacuuming at an Aqua Pets store, which he described as "real easy work" (Tr. 41, 43).

Plaintiff identified that he has COPD, carpal tunnel syndrome, arthritis in both shoulders, an aneurism, high blood pressure, and a bad back (Tr. 45–46).  He noted that whenever he engages in strenuous activity, such as sweeping a floor, he becomes short of breath (Tr. 46–47).  He also stated he has no feelings in his hands due to his carpal tunnel syndrome and resultant surgery on one of his wrists and that he frequently drops objects, especially with his right hand over which he has little or no control (Tr. 47–48, 53).  He can, however, pick up small items such as a pen and paper (Tr. 51–52).  He is able to groom himself and prepare simple meals (Tr. 52).  He stated he does not possess a driver's license and that his daughter does personal errands for him (Tr. 50).  He indicated that he goes to church and otherwise gets out about two to three times per week, but he typically sits around the house in a recliner, watches television, and uses the computer a little (Tr. 52).  Plaintiff estimated that he can walk 50 to 100 yards before having to stop because of pain and breathing difficulties (Tr. 49).  He can stand about five to ten minutes before he has to sit down, and he can sit for twenty to thirty minutes before needing to get up (Tr. 50).  He can lift five to ten pounds and climb a few stairs at a time (Tr. 50–51).

Plaintiff has arthritis in his left shoulder and has a history of surgeries to repair the shoulder (Tr. 48).  He stated he needs valve surgery for his aortic aneurism (*id.*).  Plaintiff noted that he takes nebulizer treatments three times per day, oxycodone three times per day, Zoloft once per day, and as many as four medications for his intractable blood pressure problem (Tr. 46–47, 49).

B.      Relevant Medical History

Plaintiff has a long history of lower back pain which was exacerbated by a 2008 motor vehicle injury.  He also has a history of shoulder surgeries, including a total left shoulder replacement in 1992 and a total right shoulder replacement in 1993.

In September of 2009, Plaintiff received an MRI evaluation at Baptist Imaging Center due to his complaints of chronic neck and bilateral shoulder pain (Tr. 209–11).  The MRI of the lumbar spine showed no substantial canal stenosis, but a broad-based disc bulge was noted at L4-5 (Tr. 209).  There was trace fluid in the bursa area of Plaintiff's left shoulder, and a possible partial rotator cuff tear was noted (Tr. 211).

On August 18, 2010, Plaintiff went to the emergency room ("ER") at Santa Rosa Medical Center because of chest pain and shortness of breath, but his lab results showed no evidence of myocardial infarction or pulmonary embolism (Tr. 230–31).  A history of hypertension was noted (Tr. 228).  Tests also revealed slight dilatation of the ascending aorta (Tr. 255).  On August 23, 2010, Plaintiff underwent an upper endoscopy at the hospital because he was having difficulty swallowing (Tr. 232, 238).

On December 18, 2010, Plaintiff went to the ER again complaining of chest pain with difficulty swallowing (Tr. 285).  His diagnoses included gastroesophageal reflux disease and essential hypertension (Tr. 287).  His condition improved, and he was sent home that day (*id*.).

On February 25, 2011, Plaintiff went to the ER complaining of lower back pain.  X-rays showed moderate degenerative joint disease in the lumbar spine, while the right hip area was unremarkable (Tr. 283).  The vertebral body heights and disc space heights appeared unremarkable with the exception of slight narrowing at L5-Sl.  Slight spurring was present at L3, L4 and L5, and mild sclerosis was seen of the facet joint complexes at L4-5 and L5-SI (Tr. 282). Vascular calcification was seen in the abdominal aorta and more faintly in the femoral artery (Tr. 282–83).  Accordingly, Plaintiff was diagnosed with acute low back pain, acute muscular spasm, acute sciatica, and essential hypertension (Tr. 276).  He was provided prescriptions for Tizanidine and fifteen tablets of hydrocodone with acetaminophen (*id*.).

On March 7, 2011, as ordered by Dr. Matthew Warner, Plaintiff underwent another MRI examination.  Noted were degenerative disc space narrowing and disc desiccation, plus diffuse disc bulging at L4-5, which was somewhat asymmetric to the right with disc material abutting but not displacing or compressing the emerging nerve roots within the lateral recesses (Tr. 333).  No spinal stenosis was noted (*id*.).

On April 26, 2011, Plaintiff was seen at Berryhill Medical Center by Dr. Sal Vernali with complaints of chronic back and neck pain, hypertension, and ear pain (Tr. 486). Plaintiff indicated that his pain was sharp, constant, and worse with movement. Plaintiff had previously taken Lortab but was now taking methadone and was also taking Benicar, Hydrochlorothiazide ("HCTZ"), Toprol, and Clonidine. Dr. Vernali saw Plaintiff on a monthly basis from April through September of 2011 (Tr. 469–87).

On June 18, 2011, Plaintiff was seen in the ER for evaluation of substernal chest pain that had started four days prior, plus shortness of breath and dyspnea upon exertion (Tr. 339, 349). As per Stephen Hunley, M.D., Plaintiff underwent left heart catheterization, a coronary angiogram, and an aortagram on June 20, 2011 (Tr. 351–52). Diffuse coronary artery disease was detected, and Plaintiff's right coronary artery was completely occluded in receiving collaterals from the left system (Tr. 375). On June 28, 2011, Plaintiff successfully underwent a double coronary artery bypass grafting (*see* Tr. 395–402).

On July 23, 2011, Plaintiff was seen at West Florida Healthcare because he was having suicidal thoughts, and as a result he was "Baker Acted" by the Santa Rosa Sheriff's Department (Tr. 432–33). Plaintiff provided that he had combined alcohol and Valium during the previous night (Tr. 432), and that during the day he had been on a boat outing with friends when his sister-in-law became concerned about him possibly wanting to drown himself and called 911 (*id.*). At the hospital, Plaintiff acknowledged having recently lost his wife, but he denied being suicidal or deeply depressed (*id.*). He stated he did not want to be in a psychiatric hospital. Plaintiff "promised . . . that he would cut down alcohol and definitely would not combine it with Valium" (Tr. 433). Plaintiff was assessed with "adjustment disorder not otherwise specified," and was deemed not suicidal, homicidal, psychotic, or manic (*id.*). As he was found not to meet the criteria of the Baker Act, he was discharged by Raul Jimenez, M.D., that night (*id.*).

On August 23, 2011, Plaintiff went to the ER complaining that he kept passing out, and upon evaluation he was asleep and difficult to wake (Tr. 444). Plaintiff stated that he was taking no narcotics at all, but his pharmacy records revealed prescriptions for Methadone, Oxycontin, oxycodone, and Lortab (*id.*). Cardiac testing revealed no change from an earlier EKG (*id.*). Plaintiff was counseled on overuse of narcotics and was discharged (*id.*).

On September 16, 2011, Sal Vernali, M.D., completed a Treating Source Orthopedic Questionnaire used for purposes of disability determination (Tr. 489). Dr. Vernali stated that he last treated Plaintiff on September 6, 2011 (Tr. 488). He indicated that his orthopedic diagnosis for Plaintiff was lumbago but noted that there was no gait disturbance, radiculopathy, soft tissue injury, or limited range of motion (Tr. 488–89). Dr. Vernali rated Plaintiff's lower extremity strength at 4 out of 5 and also provided that Plaintiff would not require a handheld assistive device to ambulate independently (Tr. 489). Dr. Vernali indicated that Plaintiff's grip strength was 4 out of 5 and that Plaintiff was "capable of performing fine/gross manipulations on a sustained basis" (*id.*).

On October 7, 2011, Plaintiff saw Dr. Hunley and complained of chest pain that worsened during deep inspiration and coughing (Tr. 492). Dr. Hunley noted that Plaintiff's chest discomfort sounded more like a gastrointestinal issue, so he prescribed Nexium and referred Plaintiff to endoscopy (Tr. 494).

On January 23, 2012, physician Robert Steele, M.D., completed a "Disabilty Determination Explanation" relative to Plaintiff's claim for DIB (Tr. 509–20). While giving controlling weight to the opinions of Dr. Vernali as Plaintiff's treating physician and Dr. Hunley as Plaintiff's mental health treating physician, Dr. Steele found some of Plaintiff's alleged symptoms to be "not entirely consistent with the total medical and non medical evidence" (Tr. 517). Dr. Steele evaluated Plaintiff's RFC to be at the light exertional level (Tr. 519).

On February 8, 2012, Plaintiff was hospitalized on a complaint of diffuse chest and back pain, which was determined to be likely musculoskeletal and noncardiac in nature, and Plaintiff was discharged (Tr. 637).

On February 16, 2012, Plaintiff was seen at the Santa Rosa Medical Center with chest pain. Plaintiff was also seen as having suicidal ideation and appeared to be intoxicated (Tr. 707–08).

On July 30, 2012, Plaintiff went to the hospital with shortness of breath and pain radiating down his back and into his hips and legs (Tr. 562–63). Plaintiff was found to have marked hypertension in the ER as well as a dilated ascending aorta. Plaintiff stabilized and was discharged on August 2, 2012, with a need for follow-up due to his cardiac history. Upon discharge, there was apparently an incident when Plaintiff learned he would not receive a prescription for oxycodone (Tr. 581). Consultation with a drug-monitoring site reported a "hold" placed on Plaintiff, as he had

received thirty-five prescriptions during a twelve-month period from six different providers and filled the prescriptions at five different pharmacies (Tr. 581).

On August 7, 2012, Plaintiff again visited the hospital with chest pains (Tr. 596).  Plaintiff was assessed as experiencing narcotic withdrawal, and his chest pain subsided once he was provided with oxycodone (Tr. 612).  There were also concerns that Plaintiff's withdrawal could exacerbate his hypertension and high blood pressure (*id.*).  Plaintiff was discharged the following day with enough prescribed oxycodone to last him until his scheduled appointment with his pain management doctor nine days later (*id.*).

On August 21, 2012, Plaintiff was seen at Coastal Health Occupational Pain Management for a pain management evaluation by J. Steven Hankins, D.O. (Tr. 700–03).  Plaintiff was diagnosed with  shoulder, elbow, wrist, and lumbar spine pain, plus lumbar disc degeneration, generalized multiple osteoarthrosis, and localized shoulder osteoarthrosis (Tr. 702).  On a September 18, 2012, follow-up appointment, Dr. Hankins increased  Plaintiff's oxycodone dosage because Plaintiff was reporting more pain than usual (Tr. 698).  Plaintiff continued to see Dr. Hankins or one of his physician assistants on a monthly basis through February of 2013 (Tr. 676–703).  Dr. Hankins' impressions during these visits consistently provided that in the cervical spine bruising was absent, Lhermitte's sign was not produced by neck flexion, movement did not cause pain, range of motion was normal, Spurling's Maneuver was negative, tenderness was present, and Plaintiff's upper extremity strength was rated at 4 out of 5; that in the lumbar spine bruising was absent, movement of the low back caused pain, range of motion was abnormal for flexion at 60 degrees and extension at 10 degrees, scoliosis was not present, sensation in the lower extremities was normal, the straight leg raise test was negative bilaterally, spasm was present in the paraspinous muscles, squatting could not be performed, heels standing and walking could be performed, toes standing and walking could be performed, strength testing in the lower extremities demonstrated that all muscle groups were 5 out of 5, tenderness to palpation was present; that range of motion in the shoulders, bilaterally, was decreased at about 90 degrees with decreased strength rated at 4 out of 5, and with positive impingement; and that bilaterally the wrists were positive for Tinel's and Phalen's test with no swelling noted but tenderness noted (Tr. 678, 682, 686, 690, 694, 697, 701).

On September 11, 2012, Plaintiff went to the ER complaining of substernal, non-radiating pain (Tr. 766).  Myocardial infarction was ruled out, Plaintiff's ascending aortic dilation was noted to be stable, and a stress test was negative (Tr. 767, 775–76).

On September 21, 2012, Plaintiff returned to the ER with reports of chest pain.  Myocardial infarction was ruled out, and Plaintiff's chest pain was seen as non-cardiac (Tr. 724–25).  However, he was noted to have suicidal ideation, his family reported finding a pistol next to his bed, he was intoxicated upon his arrival, and his drug screen test was positive for marijuana (*id*.).  On September 22, 2012, Plaintiff was transferred to Lakeview Center under the Baker Act.  Plaintiff reported that he had "lost his way" ever since his wife died in 2008 and that September 20 was the anniversary of her death (Tr. 533).  He stated he lacked energy and did not care about things anymore (*id*.).  While the "Baker Act state client" indicated that Plaintiff did not wish to live anymore, Plaintiff himself expressed a "desire to see improvement" (*id*.).  Plaintiff articulated no ideation, intent, or plan regarding suicide, and his suicide risk was assessed as low (Tr. 535).  There was no evidence of psychosis, but Plaintiff was found to "rank[] high for substance abuse and mental health" (*id*.).  His diagnoses included major depressive disorder, moderate, recurrent, without psychotic symptoms, alcohol abuse, and rule out opiate and benzodiazepine abuse (Tr. 558).  Plaintiff was stabilized over the next few days and released on September 26, 2012, with prescriptions for Zoloft and Trazodone (Tr. 557–58).

On March 12, 2013, Dr. Hankins provided an RFC assessment (Tr. 704–05).  Dr. Hankins opined that Plaintiff could walk less than one hour, stand less than one hour, and sit less than one hour in an eight-hour workday (Tr. 704).  He also concluded that Plaintiff could lift or carry less than five pounds frequently and between five to ten pounds occasionally, but no more than that (*id*.).  He also determined that Plaintiff would be restricted in climbing stairs or ladders, restricted from bending, and impaired in his ability to kneel due to pain in his knees and back (Tr. 704–05).  He opined that Plaintiff would not be limited in fine/gross manipulation (Tr. 704).  He stated that Plaintiff would need to rest from between thirty minutes to one hour about three to four times during the day (Tr. 705).  Dr. Hankins therefore concluded that Plaintiff was disabled from continuous employment (*id*.).

In May 2013, Plaintiff underwent a medical consultation with Michael E. Kasabian, D.O., for the purposes of a disability evaluation (Tr. 867–82). Plaintiff's subjective complaints to Dr. Kasabian included back pain radiating to his left leg and pain in multiple joints, although Plaintiff could not be more specific than that (Tr. 868). Plaintiff indicated that he was told he needed surgery on his lower back but that he was presently unable to afford it (*id*.). Dr. Kasabian noted that Plaintiff's aortic aneurysm was being monitored and that Plaintiff had COPD and hypertension (*id*.). Plaintiff stated that he had not experienced any chest pains since his bypass surgery in 2011 (*id*.). Dr. Kasabian noted that Plaintiff had "decreased sensory in both hands and both feet" with "unclear etiology" (Tr. 869). He further noted that Plaintiff's blood pressure was 194/116, his fine grip dexterity was grossly normal, and while Plaintiff appeared to have a limp on the left side and used a cane, he was capable of ambulating without the cane (Tr. 868). Dr. Kasabian performed full range of motion testing and found Plaintiff to have normal range of motion in all categories (Tr. 870–72).

Dr. Kasabian concluded that Plaintiff was capable of carrying up to 100 pounds occasionally, carrying between twenty-one and fifty pounds frequently, and carrying twenty pounds or less continuously (Tr. 873). He also found Plaintiff able to sit eight hours at a time in an eight-hour workday and stand or walk four hours at a time (Tr. 873–74). He noted that Plaintiff's limitations would be due to low back pain (*id*.). Dr. Kasabian determined that Plaintiff could frequently perform reaching, pushing and pulling tasks, and that he occasionally could perform handling and fingering activities, but that he could never feel with either hand due to his sensory issues (Tr. 875). Similarly, it was determined that Plaintiff's sensory issues in his feet would prevent him from operating foot controls (*id*.) and that Plaintiff should not operate a vehicle or be involved with moving mechanical parts (Tr. 875, 877). Plaintiff was found able to occasionally climb, stoop, kneel, crouch, and crawl, but not balance, again due to the sensory issues in his feet as well as his lower back pain (Tr. 876).

V.     DISCUSSION

    A.     Physician Opinions

Plaintiff first contends the ALJ erred by affording only "little weight" to the medical opinion of his treating physician for pain management, Dr. Hankins, while giving "some weight" to Dr.

Kasabian, who conducted a consultative examination after the ALJ's hearing, and to Dr. Steele, who provided an RFC assessment as a non-examining physician.

It is true that, under the "treating physician rule," the ALJ must accord substantial or considerable weight to the opinion, diagnosis, and medical evidence of a treating physician absent a showing of "good cause" to the contrary.  Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) (citation omitted).  "Good cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Id. at 1240–41; see also 20 C.F.R. § 416.927 ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight").  "Generally, the more consistent a physician's opinion is with the record as a whole, the more weight an ALJ can place on that opinion."  Harrison v. Comm'r of Soc. Sec., 569 F. App'x 874, 877 (11th Cir. 2014) (unpublished) (citations omitted).[1]

It is also true that there is a general preference for a treating physician's opinions over those of a non-treating or non-examining physician.  There are three tiers of medical opinion sources: (1) treating physicians; (2) non-treating, examining physicians; and (3) non-treating, non-examining physicians.  Himes v. Comm'r of Soc. Sec., 585 F. App'x 758, 762 (11th Cir. 2014) (unpublished). As with a treating physician, however, "the weight due to a non-examining physician's opinion depends, among other things, on the extent to which it is supported by clinical findings and is consistent with other evidence."  Jarrett v. Comm'r of Soc. Sec., 422 F. App'x 869, 873 (11th Cir. 2011); see also 20 C.F.R. § 404.1527(c)(3).  The ALJ must state with particularity the weight given to different medical opinions and the reasons therefor.  Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178–79 (11th Cir. 2011).  With good cause, an ALJ may disregard a treating physician's

---

[1] The undersigned cites Harrison and other unpublished cases herein only as persuasive authority and recognizes that such opinions are not considered binding precedent.  See U.S. Ct. of App. 11th Cir. Rule 36-2.  The undersigned does the same with respect to opinions of circuit courts of appeals other than the Eleventh Circuit, see United States v. Rosenthal, 763 F.2d 1291, 1294 n.4 (11th Cir. 1985), and any district court opinions cited herein.

opinion but "must clearly articulate [the] reasons" for doing so. *Id.* (quoting Phillips, 357 F.3d at 1241).

As far as assessing the relative opinions of the physicians involved in this case, the ALJ actually relied most heavily upon the opinion of Dr. Vernali, another of Plaintiff's treating physicians, according his opinion "great weight" (Tr. 28). The ALJ found that Dr. Vernali's conclusions—which included an orthopedic diagnosis of lumbago, a lack of related symptoms, and a 4 out of 5 rating for lower back strength as well as grip strength—were consistent with his treatment notes and with other medical evidence in the record (Tr. 28).

In fact, Dr. Vernali's medical assessments do not appear to have been much different in degree from those of Dr. Hankins, who rated the strength of Plaintiff's lower extremities at 5 of 5, with no bruising in the lumbar region, and who found negative results for the straight leg raise test and no issues with the heel walk and toe walk tests. However, Dr. Hankins did find mild to moderate limitations in Plaintiff's range of motion at the lumbar spine, spasm in the paraspinous muscles, and an inability to squat.

In any event, both Drs. Vernali and Hankins provided ongoing treatment for Plaintiff over the course of several months and therefore are both considered to be treating physicians. Where there are two or more treating physicians who provide inconsistent opinions, courts have found it to be the province of the ALJ resolve those inconsistencies, and courts have been reluctant to question those judgments. *See* Walker v. Sec'y Health & Human Servs., 980 F.2d 1066, 1070 (6th Cir. 1992); Munson v. Comm'r of Soc. Sec., No. 12-369-RLB, 2014 WL 1165837, at *3–4 (M.D. La. Mar. 21, 2014) (citing Cain v. Barnhart, 193 F. App'x 357, 360 (5th Cir. 2006)); Scott v. Comm'r of Soc. Sec., No. 12-00736-BAJ-RLB, 2014 WL 1239307, at *5 (M.D. La. Mar. 25, 2014) (citing Miliam v. Bowen, 782 F.2d 1284 (5th Cir. 1986)); Watkinson v. Colvin, No. 12-cv-501-JL, 2013 WL 6157857, at *2 (D.N.H. Nov. 25, 2013); Gaudet v. Astrue, No. 11-11894-RGS, 2012 WL 2589342, at *6 (D. Mass. July 5, 2012); Parrish v. Astrue, No. 2:10-cv-00091, 2012 WL 1078881, at *7 (M.D. Tenn. Mar. 30, 2012); Swieda v. Comm'r of Soc. Sec., No. 6:06-cv-1248-Orl-19KRS, 2008 WL 312720, at *2 (M.D. Fla. Feb. 4, 2008).

The ALJ sided with the opinion of Dr. Vernali for a number of reasons. First, Dr. Veranali's conclusions may have conflicted with those of Dr. Hankins, but they were consistent with those of

Dr. Kasabian and Dr. Steele (Tr. 28).  While Dr. Kasabian was non-treating and Dr. Steele was non-examining, the ALJ did not solely rely on their opinions but rather allocated "some weight" to their opinions for use in conjunction with the opinion from Dr. Vernali.  Second, the ALJ found Dr. Vernali's findings to be consistent with his own medical notes as well as with the other evidence in the record, while finding Dr. Hankins' conclusions to be inconsistent with Dr. Hankins' own medical notes, with Dr. Vernali's findings, and with the other evidence (*id*.).[2]  Third, the ALJ found Plaintiff's reporting of his daily activities—and particularly his ability to work cleaning aquariums, which work Plaintiff performed after the alleged onset date—to be consistent with Dr. Vernali's findings (*id*.).[3]

In sum, because Dr. Hankins' medical conclusions differed from the substantial evidence in the case and from the medical assessments of every other physician of record, the ALJ had substantial grounds from which to disregard those conclusions.  As the Defendant Commissioner contends, Plaintiff's argument appears to be based on the faulty premise that essentially the ALJ should have substituted Dr. Hankins' evaluations for those of all the other doctors in the case simply because Dr. Hankins was a treating physician.  The court agrees insofar as it understands that the ALJ's objective is not to substitute one opinion for another but rather to reconcile the different opinions in accordance with the record in the case.  As long as the ALJ's reconciliation and informed judgment is buttressed with substantial evidence, as it is in this case, there is no error.[4]

---

[2]  The ALJ particularly referenced Plaintiff's MRI results (Tr. 28).  Plaintiff does not challenge the ALJ's use of the MRI results but rather asks which MRI the ALJ had in mind.  Earlier in her opinion, the ALJ cited to MRI's in both September of 2009 and March of 2011, both of which reached similar results.  Both described degenerative disc issues with disc space narrowing and disc dessication but no spinal stenosis.  Both showed disc bulging at L4-5 (Tr. 209–11, 333).  Thus, the inexactitude of the ALJ's reference is not of ultimate concern.

[3]  In so saying, the ALJ found Plaintiff's medical impairments could reasonably be expected to cause Plaintiff's symptoms but that Plaintiff's assertions regarding the "intensity persistence and limiting effects of these symptoms" to not be fully credible for several reasons, including that he was seen to have full range of motion on his medical examinations, that he was able to go on a boating trip despite his symptoms, that his pain seemed to be effectively managed by medication, and that his repeated doctor visits might be owing to his "ulterior motive" of seeking painkiller medication (Tr. 23, 27).

[4]  It should be noted that there were two other main impairments addressed in the ALJ's decision.  First, the ALJ addressed Plaintiff's heart issues, which the ALJ found less significant because Plaintiff's bouts with chest pain were frequently found to be non-cardaic, and because Plaintiff acknowledged that he had not had chest pain since 2011 (Tr. 27–28).  Second, the ALJ discussed Plaintiff's mental health issues, which the ALJ discounted because Plaintiff's hospital admissions under the Baker Act were lifted almost immediately and Plaintiff otherwise had not sought longer term mental health care (Tr. 28).  The court in its review found these holdings to be supported by substantial evidence,

B.      Incomplete Hypothetical Question

Plaintiff also contends that the ALJ posed an incomplete hypothetical question to the Vocational Expert ("VE") because she failed to include Plaintiff's limitations in his hands and feet as noted by Dr. Kasabian.

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011) (quoting Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002)).  Although an ALJ must comprehensively describe the claimant's limitations in the hypothetical question, she is not required to include limitations found not credible or not supported by the evidence.  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1161 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996); McSwain v. Bowen, 814 F.2d 617, 620 n.1 (11th Cir. 1987).

As Plaintiff states, Dr. Kasabian found that, due to "sensory issues" in Plaintiff's hands and feet, he should to be limited to occasional fingering and handling, should not use foot controls or moving mechanical parts, and should not drive.  However, the ALJ only partially adopted the opinion of Dr. Kasabian, giving it "some weight as it is mostly consistent with Dr. Vernali's remarks and pain management notes" (Tr. 28).  And accordingly, the ALJ did not list Plaintiff's sensory issues as an impairment (Tr. 20).

Nonetheless, the ALJ posed a series of hypothetical questions to the VE, the second of which provided:

> If I were to assume all the limitations that I've given you in hypothetical number one, postural limitations, with restriction to light work, and were to add to that inability to only occasionally finger, but would have other manipulative restrictions that would be unlimited. The grasping -- basic grasping, handling would be unlimited but fingering specific fine manipulation would be occasional.  Would there be any positions available?

 (Tr. 58).

Thus, the ALJ incorporated Plaintiff's limitations with fingering into at least one of the hypothetical questions, and the VE responded to that hypothetical question with three occupations,

---

and because Plaintiff does not challenge either of these findings, they will not be addressed in any greater detail.

garment sorter, housekeeping cleaner, and counter clerk, all of which are classified as light and unskilled, which is the same classification as the first hypothetical upon which the ALJ ultimately relied (Tr. 29, 58–59).   Accordingly, the court finds that the ALJ's hypothetical questions incorporated the findings of Dr. Kasabian to the extent she deemed them applicable, and the answers supplied by the VE supported the ALJ's determination that there were sufficient employment positions available in the national economy given Plaintiff's impairments.  Plaintiff, therefore, is not entitled to relief on this claim.

VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making her findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED**

The decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED.**  The clerk is directed to close the file.

At Pensacola, Florida this 20th day of March 2015.


/s/ *Elizabeth M. Timothy*_____
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**